Argued March 5; affirmed March 26, 1935

# GUTHRIE *v.* FRANK ET AL.
## (42 P. (2d) 913)

*Geo. B. Guthrie* and *MacCormac Snow,* both of Portland (P. J. Gallagher, of Portland, on the brief), for appellant.

*Herbert L. Swett,* of Portland (Dey, Hampson & Nelson, of Portland, on the brief), for respondents.

BELT, J.   This is a creditor's bill wherein the plaintiff as receiver seeks to follow certain assets of the Gordon Mortgage Co., a corporation, and to apply the same in satisfaction of a judgment obtained against such company in May, 1931. During the same month a writ of execution was issued and a return nulla bona made thereon. Herbert L. Frank, Sam G. Gordon, and Ida Ruth Gordon are made defendants by reason of an alleged conspiracy whereby the assets of the above corporation were depleted to the injury of creditors.

The facts out of which this controversy arose are as follows:  Sam Gordon and his sister-in-law Ida Ruth Gordon were engaged as copartners, in the city of Portland, in the business of building and selling standardized houses on long term instalment contracts.  They begun with little capital but, through remarkable industry and ability, developed a lucrative business. About 21 salesmen were employed and over 400 houses constructed.  An office manager and a sales manager were each paid $8,000 per year.  Sam Gordon conceived the idea that cheap standardized houses could be constructed according to detailed plans similar to the method in which steel structures were built.  Each piece of lumber was lettered and numbered thus enabling expert nailers to construct a house at comparatively small cost.  The business developed to such an extent that each of the Gordons was enabled to draw an average salary of $1,000 per month.  Herbert L. Frank, who

had gained quite a reputation as sales manager in a large plumbing business, became interested in the business enterprise in which the Gordons were engaged. After a careful and extended audit of the partnership business by an expert accountant, showing net assets between $150,000 and $200,000, Frank invested therein the sum of $25,000. The Gordons executed their promissory note as evidence of such indebtedness. Frank worked two or three months with the Gordons in order to learn the details of the business and get his bearings. After Frank came into the business he and the Gordons each drew a salary of $500 per month.

In 1926 the Gordon Mortgage Co. was incorporated with a capital stock of $75,000. The 750 shares of stock, each of the par value of $100, were subscribed for equally by the Gordons and Frank. The assets of the copartnership were transferred to the corporation as consideration for the issuance of 500 shares to the Gordons. Frank cancelled his note of $25,000—which the corporation had assumed—for the 250 shares issued to him it will be observed that this close corporation at the time of its organization had a very substantial surplus if the audit of the expert accountant is accurate. It was orally agreed that the Gordons would purchase the stock from Frank if he became dissatisfied with the business. Sam Gordon was elected president; Ida Ruth Gordon, vice president; and Herbert L. Frank, secretary-treasurer. The principal business of Sam Gordon was to supervise the construction of the buildings. Ida Ruth Gordon—who was a lawyer—examined the abstracts of title and did various other legal work connected with the business. Frank had supervision over the salesmen. He was the supersalesman. Business continued to be good. The company was in excellent financial condition and had a line of credit with plain-

tiff's predecessors in interest, the American Exchange Bank, amounting to $6,000. It also had a similar line of credit with the Hibernia Commercial & Savings Bank. About 200 new houses were constructed while Frank was connected with the company. Contention, however, arose between Sam Gordon and Frank relative to the type of house that should be constructed. This controversy finally terminated in a decision whereby Frank was to withdraw from the company.

Hence, on February 3, 1927, Frank sold his stock to the Gordons for $25,000, payable in 25 monthly installments of $1,000 each. Under the terms of an escrow agreement with the United States National Bank, all the stock of the company was held as collateral security for payment of the note executed by the Gordons. When Frank sold his stock and retired from the company a nominal share of stock was issued to Vera Gordon and she was elected director in his place. On the same day, but after the withdrawal of Frank as director and stockholder, the board of directors unanimously voted to increase the salaries of Sam Gordon and Ida Ruth Gordon from $500 to $1,000 per month. Frank was paid his salary of $500 for the month of February.

Sixteen installments, each in the sum of $1,000, were paid to the United States National Bank—which remitted to Frank. The last payment on principal was made on July 10, 1928, at which time the Gordons discontinued the salaries of $1,000 per month as the business would not justify it. Checks were drawn in the name of the Gordon Mortgage Co., but the amounts thereof were charged against the salary accounts of the Gordons. The principal and interest thus paid to Frank aggregated $18,265.28. The loans which the American Exchange Bank made to the Gordon Mortgage Co. in June and July, 1928, aggregating $6,000—

and evidenced by promissory notes—constitute the basis of this suit.

It is the theory of the plaintiff, as disclosed by the complaint, that Frank had become dissatisfied as a stockholder in the company and, in order to withdraw his investment therein, entered into a scheme or conspiracy with the Gordons whereby they, in form, agreed to buy his stock with the understanding that he would be paid from the salary increase of $1,000 per month. In the trial, however, the plaintiff apparently abandoned the theory that the stock was sold to the company and not to the Gordons. The plaintiff asserts that the salary increase was unreasonable and wholly unjustifiable, being a mere subterfuge to deplete the assets of the corporation for the individual benefit of the directors. In other words, the plaintiff contends that the corporation received no consideration for the money paid to Frank for the purchase of his stock and that, therefor, all of the defendants who participated in this scheme to deplete the assets of the corporation to the injury of creditors should respond in a sum equal to the amount due on the note which has come into his hands as receiver.

■ A careful analysis of the facts convinces us that the sale of stock was a bona fide transaction. Frank did not withdraw his investment because of anticipation of the company's failure. In February, 1927, the corporation was in sound financial condition. There was no contemplation of insolvency. About 150 houses were constructed after Frank withdrew from the company. The Gordons had a large investment at stake. If Frank believed the business was going on the rocks why was he willing to take as collateral security the stock of the company? What motive would the Gordons have in entering into a conspiracy with Frank to permit him to

withdraw his investment if they believed the company was doomed to failure? The good faith of the parties is evidenced further by the fact that Frank brought action against the Gordons to collect the balance due on their note.

■ The credit of the company was not impaired until the fall of 1929. It will be recalled that the American Exchange Bank extended substantial credit to the corporation as late as June, 1928. Was it not advised as to the general financial condition of this business concern? The failure of the Gordon Mortgage Co. was the result of unusual business conditions. The stock market crash of 1929 had deadly effect on the real estate market and the equities of the company in properties sold were swept away with surprising rapidity. The mere fact, however, that insolvency finally resulted is no evidence of its existence at the time this stock was purchased from Frank in 1927. In determining whether there was a wrongful diversion of corporate assets the conduct of the Gordons and Frank is to be reviewed in the light of the conditions existing at the time the transaction was consummated.

■ It is no doubt true that the Gordons expected to pay the monthly installments to Frank from the salary increase. It does not follow, however, that plaintiff, as a general creditor, has any cause to complain of such plan if, in fact, the salaries were reasonable. Even if it be assumed that the corporation was insolvent at the time of the salary increase, the Gordons would be entitled to reasonable compensation for their services. If the corporation received consideration for the money thus paid to Frank, then, of course, there was no wrongful depletion of corporate assets. Notwithstanding the claim of unreasonable salaries is the very foundation of plaintiff's grievances, there is absolutely no evidence

tending to support such contention. On the contrary, the defendants have established by uncontradicted evidence that the salaries paid to the Gordons were reasonable in view of the character of the services rendered and the scope and importance of the business in which they were engaged.

■■ A general creditor has no right to complain about the amount of salaries fixed by a board of directors, unless at such time the corporation is insolvent and the salaries paid are so excessive as to amount to a badge of fraud. Courts, in the absence of fraud, are reluctant to interfere with the internal affairs of a corporation based on the complaint of general creditors. Hence, a wide discretion is vested in a board of directors to determine the amount of salaries to be paid to officers of the company.

The conclusion of this court that the salaries paid to the Gordons were reasonable makes it unnecessary to consider the numerous authorities cited pertaining to the trust fund doctrine. Clearly, none of them are applicable to the facts in this case.

It follows that the decree of the circuit court dismissing plaintiff's suit is affirmed. Neither party will recover costs or disbursements.

ROSSMAN, J., not sitting.